IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal No.: 2:05-cr-617 |
| | ) | |
| | ) | |
| v. | ) | PLEA AGREEMENT |
| | ) | |
| | ) | |
| OILMAR COMPANY LIMITED, INC. | ) | |
| | ) | |

## I.    **INTRODUCTION**

A.    This document contains the complete Plea Agreement ("Agreement")
between the United States and defendant, OILMAR COMPANY LIMITED, INC.
("OILMAR"), a Panamanian corporation.  No other agreement, understanding,
promise, or condition exists between the parties.  Defendant understands this
Agreement is limited to the United States Attorney's Office for the District of
South Carolina and the Environmental Crimes Section of the United States
Department of Justice.  Defendant and its counsel understand this Agreement is
not final until the Agreement has been signed by the United States Attorney, the
fully executed Agreement has been filed with the Court, and the Court  has

accepted Defendant's guilty plea.

B.    The parties expressly agree that this Agreement is entered into and is to be controlled by Federal Rule of Criminal Procedure 11(c)(1)(C). This means that either party – Defendant or the United States– may only withdraw from this Agreement if the Court rejects the Agreement and deviates from the sentencing recommendations made by the parties.

C.    Under the terms of this Agreement, Defendant will execute a written waiver of indictment and plead guilty to the count in which it is charged, as set forth below, in the one-count felony Information filed in this case.

D.    The parties agree that if Defendant breaches this Agreement or if Defendant's guilty plea is rejected, withdrawn, set aside, vacated or reversed, at any time, the United States will be free to prosecute Defendant on all charges covered by this Agreement, including any charges that might have been brought but for this Agreement, subject to FRCR 11, FRE 410 and other provisions of law.

E.    This Agreement does not limit the rights of any party to provide the Court or the United States Probation Office with a full description of Defendant's conduct, correct inaccuracies at any time, or speak at the time of sentencing consistent with the recommended provisions set forth in the Agreement. The

parties agree to allocate at sentencing in favor of the joint recommendation regarding the appropriate sentence, as set forth in this Agreement.

F.    Because this is a negotiated resolution of the case against Defendant, Defendant waives any claim for the award of attorney's fees from the United States.

## II.    **WHAT DEFENDANT AGREES TO DO**

Defendant agrees the following obligations are material to this Agreement. Defendant agrees that any violation of or failure to fulfill these obligations will be a material breach of this Agreement. If Defendant breaches this Agreement, Defendant understands the United States, in its sole discretion, may withdraw from this Agreement with respect to Defendant and may reinstate prosecution against Defendant on any charges arising out of the investigation in this matter. Whether Defendant has violated the terms of this Agreement will be determined by the Court at an appropriate hearing during which any of Defendant's disclosures will be admissible and the United States' burden is by a preponderance of the evidence.

A.    Defendant agrees to waive indictment and plead guilty as charged in the Information in this case: Defendant agrees to plead guilt to Count 1 charging a violation of the Act to Prevent Pollution from Ships by Failing to Maintain an Oil Record Book, in violation of 18 U.S.C. § 1908(a) and 33 C.F.R. § 151.25(a), (h).

B.     Defendant agrees to freely and openly acknowledge responsibility for its acts and omissions, and the acts and omissions of its employees and agents, that constitute the factual basis for its guilty plea.

C.     Defendant agrees that the statutory maximum amount of the fine to be imposed for the count in the Information to which it will plead guilty in this case is $500,000.00, 18 U.S.C. § 3571(c)(3), or twice the gross pecuniary gain derived from the crimes or twice the gross pecuniary loss caused to the victims of the crime, whichever is greater, 18 U.S.C. § 3571(d).

D.     Defendant agrees to pay a criminal fine in the total amount of three hundred thousand dollars ($300,000.00), payable at the time of sentencing.

E.     Defendant has stated that it does not presently own or operate any vessels. If, and only if, Defendant acts as the owner, operator, manager, or manning agent for any vessel at any point during the period of probation, Defendant agrees to notify the United States of its change in circumstance and to develop, adopt, implement and pay for a comprehensive Environmental Management System ("EMS") during its term of probation. Defendant agrees that any EMS plan will comply with the special conditions of probation outlined below, and will be subject to the approval of the United States. If Defendant changes names, re-organizes, merges, or otherwise ceases operations in its current form, the person or entity acquiring the assets or taking over the operation of Defendant shall take over the  responsibility to develop, implement, fund and

maintain the EMS, provided that the person or entity acquiring the assets or taking over the operations are wholly or partially owned or controlled, directly or indirectly, by Defendant, its directors, agents or employees. Defendant acknowledges that these are conditions of probation.

F.     Defendant, in the event that it acts as the owner, operator, manager, or manning agent for any vessel at any point during its period of probation, agrees to adequately fund the EMS in an amount acceptable to the United States by depositing said funds to an escrow account acceptable to the United States and to be used solely for the purpose of developing, adopting, implementing and paying for their EMS. Defendant acknowledges that this is a condition of probation.

G.     Defendant agrees to be placed on organizational probation for a term of three years.

H.     Defendant agrees that it shall commit no further violations of United States federal, state or local law, and shall conduct all its operations in accordance with MARPOL and APPS. Defendant acknowledges that this is a condition of probation.

I.     Defendant agrees to have a representative who is duly authorized by Defendant's Board of Directors, and with authority to speak for Defendant, appear and enter the guilty plea and also appear for imposition of sentence.

J.     Defendant agrees to provide to the United States and the Court

written evidence, in the form of a notarized resolution of its Board of Directors with corporate seals, certifying that Defendant is authorized to waive its right to Indictment, to plead guilty to the Information in this case, and to enter into and comply with all provisions of this Agreement and the agreed upon EMS. The resolution shall further certify that the President or Chief Executive Officer, or his or her designee, is authorized to take these actions and that all corporate formalities required for such authorization, including but not limited to approval by Defendant's directors, have been observed.

K.    Defendant agrees to provide the United States Attorney's Office for the District of South Carolina and the United States Probation Office for the District of South Carolina with immediate notice of any name change, business reorganization, or similar action. No change in name, change in corporate or individual control, business reorganization, change in ownership, merger, change of legal status, or similar action shall alter Defendant's responsibilities under this Agreement. Defendant shall not engage in any action to seek to avoid the obligations and conditions set forth in this Agreement except as provided herein.

L.    This Agreement, together with all of the obligations and terms hereof, shall inure to the benefit and shall bind assignees, subsidiaries, successors-in-interest, or transferees of Defendant.

M.    Neither the United States nor Defendant will seek any downward

departures or adjustments under the United States Sentencing Guidelines or any other authority.

N.    Defendant understands that by pleading guilty it waives its right to appeal its conviction. Defendant also understands and agrees that as consideration for the United States' commitments under this Agreement, and if the Court accepts this Agreement and imposes a sentence within its parameters, it will knowingly and voluntarily waive its right, contained in 18 U.S.C. § 3742, to appeal the sentence imposed. Furthermore, Defendant also knowingly and voluntarily agrees to waive its right to collaterally attack this conviction and sentence. The only exceptions to this collateral attack waiver are as follows: 1) any challenge to its conviction or sentence alleging ineffective assistance of counsel based on information not now known to the Defendant and which, in the exercise of reasonable diligence, could not be known by the time the Court imposes sentence; and 2) a challenge to the voluntariness of its guilty plea.

## III.    **WHAT THE UNITED STATES AGREES TO DO**

A.    In exchange for Defendant's guilty plea to the charge in the Information, and based on the information known to the United States at the time of this Agreement, the United States agrees not to seek additional criminal prosecution of Defendant, or its vessel managers, Antares Naviera, S.A., in the

District of South Carolina relating to the subject matter of this investigation, as outlined in the Information and the factual basis of this Agreement. The parties understand that this Agreement does not apply to any individuals, including but not limited to Defendant's present and former employees, officers, agents and contractors. The parties further understand that this Agreement applies only to federal criminal charges and only binds the United States Attorney's Office for the District of South Carolina and the Department of Justice Environmental Crimes Section. Defendant has discussed this Agreement with its attorneys and understand that nothing contained in this Agreement is meant to limit the rights and authority of the United States to take further civil or administrative action against Defendant or any affiliated or related corporations, including but not limited to, any listing and debarment proceedings to restrict rights and opportunities of Defendant to contract with or receive assistance, loans and benefits from United States agencies.

IV.    **ADVISEMENT OF MAXIMUM PENALTIES**

A.    The maximum penalty that applies to the one count in the Information includes: (1) a fine of $500,000.00 or twice the gross gain or loss resulting from the unlawful conduct, Title 18, United States Code, Section 3571; (2) five years probation; and (3) a special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

B.    Unless otherwise provided, the criminal fine payment will be by check or money order, and is to be delivered to the Clerk of Court, United States District Court, District of South Carolina.

## V.    **RECOMMENDATIONS AS TO SENTENCE**

Pursuant to Fed. R. Crim. P. 11(c)(1) (C), the parties agree and recommend that the following sentence is appropriate and should be imposed in this case:

A.    Defendant shall pay a criminal fine of $300,000.00. The United States agrees that no restitution is required, because there is no evidence of any specific discharge and no evidence of any environmental damage.

B.    Defendant shall pay a special assessment of $400 per count to the Victim's Assistance Fund, pursuant to Title 18, United States Code, Section 3013(a)(2)(B), on or before the date that the Court imposes sentence.

C.    Defendant shall be placed on organizational probation for a period of three years.

D.    In addition to the Court's standard conditions of probation and in addition to conditions that may be set by the Probation Office, the terms of probation shall include the following specific conditions:

1. Defendant shall commit no further violations of laws, regulations or environmental permits of the United States, including those for which primary

enforcement has been delegated to a state.

2. Defendant, if and only if it acts as the owner, operator, manager or manning agent of any vessel, shall develop, implement, and maintain a permanent Environmental Management System that shall comply with the special conditions outlined below:

a.    The EMS will establish that: all environmental and related operational risks have been identified; such risks are being appropriately managed and potential risks are avoided; all international, federal, state and local laws, regulations, and environmental permit requirements are being adhered to; appropriate policies, programs and procedures are in place; organizational responsibilities are clearly defined, understood and implemented; environmental quality control assurance and verification systems are in place, as determined by appropriate self-policing and third-party audits; company operations, including contractor operations and on-site service provider operations, do not present actual risks to the environment. Defendant shall ensure that the environmental compliance program is diligently enforced by the officers and managers of Defendant.

b.     Defendant shall be responsible for all costs associated with the development, implementation, maintenance and monitoring of the EMS.

c.     If an EMS is required during the period of probation, a Court-appointed monitor shall monitor and ensure Defendant's compliance with the Plea Agreement and probation conditions and the development, implementation and maintenance of the EMS in accord with the Standards and Requirements filed with the Court. The Court-appointed monitor will be approved by the Court, United States Attorney's Office, Probation Office, and United States Coast Guard. Three names agreeable to Defendant will be provided to the United States for consideration. Defendant and the United States will provide one proposed candidate for the Court's approval. Defendant will assume all costs and expenses associated with the employment and expenses of the monitor. Defendant agree to provide the monitor, immediately upon request, with unrestricted access to all ships, facilities, employees, documents and computers, relevant to monitoring of the EMS and to facilitate access to contractors and contractor

employees. All reports and draft reports issued by the monitor will be delivered to the Court, Probation Office, United States Attorney's Office and the United States Coast Guard prior to or simultaneously with delivery to Defendant.

d.     Defendants will pay an amount adequate to fund the EMS, and agreed to by the United States, into an escrow account acceptable to the United States to be used solely for the purpose of developing, adopting, implementing and paying for their EMS.

E.  Pursuant to Rule 32(c)(1)(A)(ii), Federal Rules of Criminal Procedure, the parties agree to waive the presentence investigation/report process and proceed to sentencing on the day the guilty plea is entered, since the information in the record will enable the Court to meaningfully exercise its sentencing authority under 18 U.S.C. § 3553.

VI.     **ELEMENTS OF THE OFFENSE**

In order to sustain a conviction for failing to comply with the Act to Prevent Pollution from Ships, in violation of 33 U.S.C. § 1908(a), as charged in this case, the United States must prove beyond a reasonable doubt that Defendant knowingly failed to maintain an accurate Oil Record Book in which all overboard

discharges were fully recorded as required by the Act to Prevent Pollution from Ships.

Under principles of corporate liability, as these principles apply in this case, a corporate defendant may be liable for the actions of its agents. E.g., United States v. Beusch, 596 F.2d 871 (9th Cir. 1979); United States v. Powder Puff Co., 163 F.2d 1008 (7th Cir. 1947); New York Central and Hudson River R.R. v. United States, 212 U.S. 481, 495 (1909).

## VII.  **FACTUAL BASIS FOR THE PLEA**

Defendant OILMAR COMPANY LIMITED, INC. ("OILMAR") is a Panamanian company.  OILMAR, acting both directly and through its agents, owned the M/T SAN SEBASTIAN ("SAN SEBASTIAN"), a 749-foot Panamanian flagged oil tanker, that transported oil to various ports around the world, including Charleston, South Carolina.

OILMAR contracted with "COMPANY A," an unrelated crewing company, which provided the captain and entire crew of the SAN SEBASTIAN. The SAN SEBASTIAN had a crew of seven seamen of different ranks working in the vessel's engine room, including a Chief Engineer, First Engineer, Second Engineer, Third Engineer and three Oilers.  Each Engineer was generally paired with one Oiler and together they worked two four-hour shifts per day.  All served

under the command of the Chief Engineer. The Chief Engineer had overall responsibility for engine room operations, including the supervision of daily operations, formulating and implementing engine room procedures, and verification that all systems, including the Oily Water Separator, were functioning. The Chief Engineer reported to the Master who was responsible for all vessel operations.

Engine room operations in marine vessels such as the SAN SEBASTIAN produce quantities of waste oil and sludge. Some of the waste oil, together with water and other liquids, accumulates in the bottom or "bilge" of the vessel. This waste liquid typically drains into the "bilge wells," small compartments set into the bottom of the engine room. The bilge waste is then collected and run through various processes designed to separate the oil and other wastes from the water. These processes include settling tanks and the Oily Water Separator ("OWS"), a pollution prevention machine designed to remove or separate out oil. After passing through the OWS, bilge water containing less than fifteen parts per million of oil may be discharged overboard. MARPOL Annex I, Reg. 9(4), 33 C.F.R. §151.10(a), §151.10(b). Oil removed from the bilge waste, along with other waste oils from the ship, is stored in a sludge tank. Some ships burn the sludge in an incinerator on the ship. Oil contaminated bilge waste and other waste oils, including sludge, may be offloaded while the vessel is in port and

properly disposed of on shore. MARPOL Annex I, Reg. 9(6), 33 C.F.R.
§151.10(f)(2).

The MARPOL Protocol ("MARPOL") is an international treaty
implemented in the United States by the Act to Prevent Pollution from Ships
("APPS"). 33 U.S.C. §§ 1901 *et seq*. MARPOL sets forth the international
standards for the maximum amount of oil to be discharged overboard from
vessels. This standard is 15 parts per million ("PPM"). MARPOL Annex I, Reg.
9(4),  33 C.F.R. §151.10(a)(5), §151.10(b)(3). MARPOL also requires vessels to
have and maintain an oil sensing device, such as that found on an OWS, to
prevent the discharge of a mixture containing more than the legally permitted
concentration of oil. MARPOL Annex I, Reg. 16, 33 C.F.R. §151.10(a)(6),
§151.10(b)(5). Typically, when such a sensor detects more than the allowable
parts per million of oil, it redirects that effluent to a storage tank on board a
vessel.

MARPOL and Federal law requires that oil tankers of more than 150 gross
tons, such as the SAN SEBASTIAN, must maintain a machinery space Oil
Record Book ("ORB") in which transfers of oil, including the disposal of oily
waste and the overboard discharge or disposal of bilge waste that has
accumulated in machinery spaces must be fully recorded on a tank to tank basis.
MARPOL Annex I, Reg. 20,  33 C.F.R. § 151.25(a) and (d).  In the event of an

emergency, accidental, or other exceptional discharge of oil or an oily mixture, a statement must be made in the ORB explaining the reasons and circumstances for the discharge. MARPOL Annex I, Reg. 20, 33 C.F.R. § 151.25(g). Each completed transfer or discharge of oil recorded in the ORB must be signed by the person or person in charge of the operation, and each completed page of the ORB must be signed by the Master in charge of the ship. MARPOL Annex I, Reg. 20, 33 C.F.R. § 151.25(h). The ORB must be maintained on board the vessel for not less than three years and must be readily available for inspection at all reasonable times. MARPOL Annex I, Reg. 20, 33 C.F.R. § 151.25(k). These requirements apply to ships operated under the authority of a country other than the United States while in the navigable waters of the United States, or while at a port or terminal under the jurisdiction of the United States. 33 C.F.R. § 151.09(a)(5).

The United States Coast Guard is charged with enforcing federal law and is empowered to board vessels and conduct investigations of potential violations. 14 U.S.C. § 89(a). When a vessel is at a port under the jurisdiction of the United States, the United States Coast Guard is authorized to examine the vessel's ORB to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate procedures, whether it poses any danger to United States ports and waters, and whether the vessel has discharged any oil or oily mixtures in violation of MARPOL, APPS, or any other applicable federal

regulation. 33 C.F.R. § 151.23(a)(3), 151.23(c).

If the Coast Guard finds evidence that a vessel is not in substantial compliance with MARPOL or APPS, the Coast Guard is empowered to deny a vessel's entry to a United States port or detain a vessel until it determines that the vessel does not present an unreasonable threat to the marine environment. 33 C.F.R. § 151.07(b), 151.25(b). Coast Guard inspectors have additional enforcement tools at their disposal against vessels and persons found to be in violation of applicable laws, including civil-administrative penalty adjudications, and revocation of customs clearance. 46 U.S.C. § 91; 33 C.F.R. § 1.07.

On May 31, 2002, the United States Coast Guard conducted a Port State inspection of the SAN SEBASTIAN when it arrived in Charleston, South Carolina. While inspecting the SAN SEBASTIAN, the inspectors examined the ship's documents including the machinery space ORB, the OWS, and associated piping and valves.

While examining the ship's machinery space ORB, which was provided by the ship's Master and reviewed in the presence of the ship's Master and Chief Engineer, the United States Coast Guard inspector noticed that the most recent entry, dated May 29, 2002, indicated that the ship had operated its OWS for 16 straight hours and processed 39.7 cubic meters ("M3") of waste from the Bilge Tank. The inspector was aware from the ship's International Oil Pollution

Prevention Certificate that the maximum OWS processing capacity was 2 M3 per hour and therefore the OWS could not process 39.7 M3 in 16 hours.

During the inspection of the engine room of the SAN SEBASTIAN, the United States Coast Guard found oil in the overboard discharge valve downstream from the OWS. When the OWS is operated properly, there should be no oil in the Overboard Discharge Valve. The four-bolt-flange connecting the pipe leading to the Overboard Discharge Valve only had two bolts connecting it instead of the usual four. When this section of pipe was disconnected, the inspectors observed that section leading directly to the Overboard Discharge Valve was wet with oil while the preceding section leading from the OWS was dry and contained no oil, indicating to the inspectors that the OWS had been bypassed. A wire support bracket, capable of supporting a bypass hose, was also found in close proximity to the Overboard Discharge Valve. In addition, the inspectors noted that the bolts on the flanges on both the intake and discharge sides of the OWS were worn, indicating that they had been frequently disconnected. Under normal conditions, there is no reason for these flanges to be disconnected. The piping on the intake section of the OWS was freshly painted only on its visible side, the side that would normally be visible to persons, such as inspectors, in the engine room. United States Coast Guard inspectors also found a flexible section of rubber hose equipped with a four-bolt flange on each end that

appeared consistent with its use as a means of bypassing the OWS in the overboard discharge of oil contaminated bilge waste. The flanges on the hose matched the flanges on the intake and discharge side of the OWS and inspectors verified that the hose was long enough to make the connection.

Oil samples were taken from the Overboard Discharge Valve, the section of pipe immediately preceding the Overboard Discharge Valve, the section of flexible rubber hose, the OWS, and the bilge pipe leading to the OWS. These samples were sent to the United States Coast Guard Marine Safety Laboratory for analysis. According to the United States Coast Guard, the analysis determined that the samples taken from the Overboard Discharge Valve, the section of flexible rubber hose, and the bilge pipe leading to and from the OWS matched, but none of these samples matched the samples taken from inside the OWS. The sample analysis, as well as the physical evidence observed by the inspectors, established that oily waste had been discharged through the Overboard Discharge Valve on the SAN SEBASTIAN in a quantity greater than 15 ppm of oil to water. However, the United States discovered no evidence of any specific overboard discharge and no evidence of environmental damage.

The ship's ORB contained no entries reporting the overboard discharge of oil contaminated bilge waste or other oily waste discharged in a quantity greater than 15 ppm of oil to water.

## VIII. **DEFENDANT'S AGREEMENT AND UNDERSTANDING OF THE TERMS OF THIS PLEA AGREEMENT**

Defendant agrees, by and through its duly authorized representative, and does hereby state its agreement to and understanding of this Agreement as follows:

A.    Defendant OILMAR wishes to enter a plea of guilty to Count 1 of the Information, which charges it with violating the Act to Prevent Pollution from Ships by failing to maintain an Oil Record Book, in violation of 18 U.S.C. § 1908(a) and 33 C.F.R. § 151.25(a), (h).

B.    Our undersigned Attorneys have explained the charges to which Defendant is pleading guilty, the necessary elements, and the consequences of the guilty plea.

C.    Defendant is admitting that the allegations against it in the Information and the factual basis for its plea are substantially true and correct to the best of its knowledge.

D.    Defendant understands that by pleading guilty it gives up and agrees to waive the following rights:

--    The right to plead not guilty or to persist in that plea if it has already been made;

--    The right to a speedy and public trial by a jury on the issue of guilt;

-- The right to object to the composition of the grand or petit jury;

-- The right to be presumed innocent and not to suffer any criminal penalty unless and until Defendant's guilt is established beyond a reasonable doubt;

-- The right to be represented by a lawyer at trial and if necessary to have a lawyer appointed to represent Defendant at trial– Defendant understands it is not waiving its right to have counsel represent them during the sentencing phase of its case;

-- The right to confront and cross examine witnesses against Defendant and the right to subpoena witnesses to appear in its behalf;

-- The right to remain silent at trial, with such silence not to be used against it, and the right to testify on its own behalf;

-- The right to contest the validity of any searches conducted on its property or person;

E.    Defendant is fully aware that if it were convicted after a trial and sentence were imposed on it thereafter, it would have the right to appeal any aspect of its conviction and sentence. Knowing this, Defendant voluntarily waives its right to appeal its conviction. Furthermore, Defendant also knowingly and voluntarily agrees to waive its right under 18 U.S.C. § 3742 to appeal any

aspect of the sentence imposed in this case, if the Court imposes a sentence within the parameters of this Agreement. Furthermore, Defendant knowingly and voluntarily waives its right to collaterally attack any aspect of its conviction or sentence, except for a challenge based upon ineffective assistance of counsel -- based on information not now known by Defendant and which, in the exercise of due diligence, could not be known by the time the Court imposes the sentence-- which affected either its guilty plea or the sentence imposed by the Court. Defendant is fully satisfied with the representation given it by its attorneys. Defendant and counsel have discussed all possible defenses to the charges. Defendant's attorneys have investigated this case and followed up on any information and issues Defendant has raised with them to Defendant's satisfaction and counsel has taken the time to fully explain the legal and factual issues involved in my case to Defendant's satisfaction. We have discussed how Defendant's sentence will be calculated under the United States Sentencing Commission Guidelines, as well as the statutes applicable to the offenses, and any other factor that will affect the sentence calculation in this case. We have also discussed the sentencing provisions of the Agreement.

F.     Defendant further understands that if it pleads guilty, there will not be a trial and that the Court will ask our duly authorized representatives under oath to answer questions about these offenses. Defendant understands that it may

be prosecuted if, through their representatives, it makes false statements or gives false answers and may suffer other consequences set forth in this Agreement.

G.     Defendant understands that it has a right to plead not guilty and that no one can force it to plead guilty. If anyone, including our attorney, has made any promises other than what is contained in this Agreement to induce Defendant to plead guilty, Defendant will inform the judge when it appears in Court and stand before him to enter its plea.

H.     Defendant understands that no one, including its attorneys, can guarantee the outcome of its case or what sentence the Court may impose if a guilty plea is entered. Defendant understands that the discussions between Defendant and its attorneys concerning the sentence exposure or the actual sentence the Court might impose are only estimates and do not bind the Court. Defendant understands that the Court has the ultimate discretion to determine the sentence to be imposed in this case. Defendant understands that it may withdraw from this Agreement, pursuant to Rule 11(c)(1)(C), only if the Court rejects the agreement and deviates from the sentencing recommendations made by the parties in this Agreement. If the Court accepts this Agreement, Defendant may not withdraw its guilty plea or withdraw from this Agreement.

I.     Defendant understands that anything that it discusses with their attorneys is privileged and confidential, and cannot be revealed without its permission, except as provided herein. Knowing this, Defendant agrees that this

document will be filed with the Court.

J.      This document contains all of the agreements made between
Defendant, its attorneys, and the attorneys for the United States regarding
Defendant's pleas.  There are no other promises, assurances, or agreements
between Defendant, its attorneys, and the United States that have affected
Defendant's decisions to enter guilty pleas or to enter into this Agreement.  If
there were, Defendant would so inform the Court.  Defendant understands that if
it breaches this Agreement in any way the United States will be free to prosecute
the Defendant on all charges for which there is probable cause, arising out of the
investigation of this case, and to reinstate any charges dismissed pursuant to this
Agreement.

K.      Defendant, through its duly authorized representatives, has read this
Agreement carefully and understand it thoroughly.  Defendant knows of no
reason why the Court should find it, or its authorized representatives, incompetent
to enter into this Agreement or to enter guilty pleas.  Defendant enters into this
Agreement knowingly and voluntarily, and therefore wishes to enter a plea of
guilty to the count alleged against it in the Information in this case.

DATED: ___June 23, 2005___   Signature _____

                             Print Name __Alan C Trachtman  for__
                             OILMAR COMPANY LIMITED, INC.

As counsel for the respective Defendant, I represent, I have discussed with my corporate client and its duly authorized representative the terms of this Agreement, have fully explained the charge to which it is pleading guilty and the necessary elements, all possible defenses, and the consequences of its plea. Based on these discussions, I have no reason to doubt that the Defendant is knowingly and voluntarily entering into this Agreement and entering a plea of guilty. I know of no reason to question the competency of my corporate client or its duly authorized representative to make these decisions. If, prior to the imposition of sentence, I become aware of any reason to question the Defendants' competency to enter into this Agreement or to enter a plea of guilty, I will immediately inform the Court .

DATED: June 20, 2005

Matthew R. Hubbell, Esquire
Seven State Street
Charleston, South Carolina 29401

Alan C. Trachtman, Esquire
Healy & Baillie, LLP
61 Broadway
New York, New York 10006-2701

Jeremy J.O. Harwood, Esquire
Healy & Baillie, LLP
61 Broadway
New York, New York 10006-2701

Attorneys for OILMAR COMPANY LIMITED, INC.

On behalf of the United States, the following accept the offers of OILMAR COMPANY LIMITED, INC. to plead guilty under the terms of this Agreement.

JONATHAN S. GASSER
Acting United States Attorney

DATED: _6/29/05_

Kevin F. McDonald
Assistant United States Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201

DATED: _6/29/05_

Joseph A. Roux, Jr.
Trial Attorney
Environmental Crimes Section
United States Department of Justice
601 D. Street
Washington, DC 29004